IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs January 17, 2018

### STATE OF TENNESSEE v. BRANDON LACY FRANKLIN

**Appeal from the Criminal Court for Davidson County**
**No. 2014-I-856      Mark J. Fishburn, Judge**

_____

### No. M2017-01081-CCA-R3-CD

_____

Defendant, Brandon Lacy Franklin, appeals the trial court's revocation of his community corrections sentence and imposition of an increased sentence of ten years' incarceration. Upon our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), Chris Street-Razbadouski, and Jared Mollenkof (at hearing), Assistant District Public Defenders, for the appellant, Brandon Lacy Franklin.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Brian Ewald and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

*Factual and Procedural Background*

On September 17, 2014, Defendant pled guilty to one count of sale of more than .5 grams of cocaine.[1]  The State summarized the facts of the case as follows:

[O]n May 20th of 2014, the Hermitage Crime Suppression Unit of the Metro Nashville Police Department utilized a confidential informant ["CI"] to conduct a narcotics operation in the Family Dollar parking lot here in Davidson County.  There were phone conversations and text messages with the defendant who the CI knew as B-Dog.  They set up an agreement for a $240 cocaine sale.  Through different events, they ultimately met up at a location in Davidson County.  There was 2.4 grams of cocaine that was sold for approximately $240.

Defendant was sentenced to eight years on supervised probation with the first year to be spent in an in-patient drug treatment program through Safe Harbor.

About five months later, on February 12, 2015, a probation violation warrant was issued alleging that Defendant had been arrested for simple possession and possession of drug paraphernalia, had failed to report his new arrest, had left the Safe Harbor program without permission, and other violations.  On April 30, 2015, Defendant waived his right to a hearing and conceded that he had violated probation.  According to Defendant, he left the Safe Harbor program because of a conflict with his roommates.  The trial court accepted the parties' agreement that Defendant be reinstated to probation with the added condition that he complete the 180-day Re-Entry drug treatment program.  The trial court wondered whether they were "just postponing the inevitable" and whether Defendant would "be back here in about three or four months."

About five months later, on October 7, 2015, a second probation violation warrant was issued alleging that Defendant had left the Re-Entry program after only a month, had given a false address, and other violations.  On November 5, 2015, Defendant waived his right to a hearing and conceded that he had violated probation.  The trial court again reinstated Defendant to probation and accepted the parties' agreement for him to enter the 4:13 Strong residential treatment program, which was to begin in January.  Pending admission to the program, Defendant was ordered to live with his mother and submit to weekly drug screens.

One month later, on December 8, 2015, a third probation violation warrant was issued alleging that Defendant had tested positive for cocaine and marijuana three times since being reinstated to probation.  On January 6, 2016, the trial court continued the probation violation hearing to February 10, 2016, and ordered that Defendant submit to

---

[1] Defendant also pled guilty to one count of leaving the scene of an accident in exchange for a time-served sentence of 30 days.  That conviction and sentence are not part of the present appeal.

daily drug tests until his acceptance into a residential treatment program. On February 1, 2016, an amended probation violation warrant was issued alleging that Defendant tested positive for cocaine and marijuana once and had failed to report for testing three times. Defendant did not appear for the February 10 court date, and the amended warrant was not executed until Defendant was arrested on May 13, 2016.

On June 6, 2016, the trial court held a probation violation hearing. Defendant admitted that he stopped reporting for his court-ordered drug screens and that he did not get into the 4:13 Strong program. Defendant testified that he was unable to complete the initial "mental toughness week" of the 4:13 Strong program because he had been locked up for all except the last two days. Defendant stated that he was living with his mother, working construction, and "just staying out of trouble." Defendant admitted that he was still using drugs and had a drug problem. As to his prior attempts at drug treatment while on probation, Defendant stated that he had left Safe Harbor after less than two months because "it was in a drug neighborhood" and that he had been kicked out of Re-Entry because he did not have a job. Defendant characterized those programs as halfway houses rather than treatment programs and asked the trial court to give him another chance with a treatment program through Samaritan Recovery Center.

On cross-examination, Defendant explained that he tested positive immediately after his reinstatement in November because he had used drugs while in jail and that his subsequent positive drug screens were due to his continued drug use. Defendant explained that he tested positive in January because he used drugs after failing to get into the 4:13 Strong program and that he subsequently stopped reporting for testing. Defendant testified that he would rather go to the Samaritan program instead of Judge Norman's drug court out of Criminal Court Division IV because he had heard that "it wasn't a good program" and that people "ran away from it." The trial court asked if he was "willing to bet an additional four years of your life for your plan versus Judge Norman's Drug Court," and Defendant agreed that he was.

The trial court sustained the violation and ordered that Defendant restart his eight-year sentence on community corrections. Defendant was to be released to his mother on June 13 and was to report to Samaritan Recovery House on June 14. Upon completion of Samaritan's in-patient program, Defendant was ordered to enter either their transitional living program or be screened for the General Sessions drug court. Defendant signed an "agreed stipulation" that any future violation, if sustained, would result in a resentencing hearing with the new sentence to be placed into effect. The trial court adamantly warned Defendant that "[i]f you come back, you're going to the penitentiary, [and] the only issue is how long you go[.]"

At a status hearing on September 1, 2016, the trial court found that Defendant had completed the Samaritan Recovery program, was living with his mother, and was in

compliance with the General Sessions drug court. An amended judgment was entered ordering Defendant to continue to comply with all conditions of drug court and community corrections.

About two months later, on October 31, 2016, a community corrections violation warrant was issued alleging that Defendant "admitted to Safe Harbor Staff that he would be positive for cocaine," "was kicked out of Safe Harbor for selling drugs," and was considered an absconder by failing to report to drug court. On March 22, 2017, the trial court held a community corrections violation hearing.

Pastor Travis Carter testified that he was the director of the Safe Harbor program in Nashville. Pastor Carter testified that Defendant was sent to Safe Harbor from the General Sessions drug court in September of 2016 to begin a six-month residential treatment program. The rules of the program included continued weekly attendance in drug court, passing all drug tests, full-time employment, and participation in daily classes with a focus on recovery. When Defendant entered the Safe Harbor program on September 19, 2016, he tested positive for cocaine and marijuana, "which was rare because . . . he came from jail." Pastor Carter explained that even though most people needed some time "to adjust to the program, get acclimated," Defendant had a "slow start" and "never quite seemed to get it." According to Pastor Carter, Defendant "didn't want to be there from the start" and "was thinking about leaving the program," which he could not do without the drug court's permission.

Pastor Carter testified that in October, he saw Defendant downtown around 10:00 p.m., past his 9:00 p.m. curfew. Pastor Carter explained that he and his wife were leaving dinner on a Friday night when he saw Defendant on Second Avenue, asked him what he was doing there, and informed him that he was AWOL. The following day, several people tested positive and accused Defendant of giving them cocaine. Pastor Carter confronted Defendant with the accusations and asked him to take a drug test. Defendant refused to take a drug test and admitted that he had used cocaine. Defendant "then grabbed his backpack and hit the gate and left" the program. Pastor Carter was unable to substantiate the allegations against Defendant because even though three different people said that they got the cocaine from Defendant, "their instincts are to rat on the guy who left the program." Pastor Carter testified that he has "a liaison who handles drug court for me" and who informed drug court that Defendant had left the program.

On cross-examination, Pastor Carter testified that when he called Defendant to his office to discuss the accusations of him selling cocaine, Defendant never responded. Pastor Carter learned that Defendant was leaving the program and ended up having the conversation with Defendant regarding the accusations in the parking lot. Defendant admitted using cocaine but denied selling it. Pastor Carter did not recall Defendant asking who had made the accusations against him. When Pastor Carter asked Defendant

to submit to a drug test, he "stormed off, got his bag[,] and left." Pastor Carter never found any drugs on Defendant's person or in Defendant's room. Pastor Carter stated that he never asked Defendant to leave the program and that if there was a notation to that effect in Defendant's drug court file, it was incorrect.

Theresa Fuqua, a representative from the General Sessions Drug Court, testified that Defendant enrolled in the drug court program on August 24, 2016. Defendant was released to a halfway house on August 31 but did not return to the halfway house on September 1. As a consequence, the General Sessions judge sent Defendant to jail on September 7. Ms. Fuqua was in contact with Defendant's community corrections officer during this time. On September 19, Defendant was released to Safe Harbor to get "another chance . . . to try to do the program." Defendant's drug court file indicated an incident on October 5 where Defendant left the Safe Harbor property and returned. There was another notation that on October 10, he admitted to being positive for cocaine and was asked to leave the property for selling cocaine. Defendant then failed to show up for drug court on October 12. Ms. Fuqua asked Defendant's community corrections officer to file a violation warrant at that time. Defendant did not return to drug court at any point after October 12. Ms. Fuqua recalled speaking to Defendant's mother to inform her of the community corrections violation but did not recall ever speaking to Defendant.

Kelly Franklin-Sanders, Defendant's mother, testified that she was in contact with Defendant every day while he was in the Safe Harbor program.[2] She felt the staff at Safe Harbor were "antagonizing" toward Defendant. At one point, she spoke to a staff member named Joshua who said that Defendant had been "giving [them] a hard time" and had been gone from the property for two or three hours. Ms. Franklin-Sanders tried to explain that Defendant went to the emergency room for high blood pressure, but "Josh wouldn't take a paper that he was supposed to have given him . . . to state that he was at the emergency room." She questioned Pastor Carter about whether he was "in a position to help these gentlemen come from somewhere that you have come from" or whether he used his position to antagonize, intimidate, and set people up to fail.

Ms. Franklin-Sanders testified that Defendant had been in special education classes since elementary school. Defendant was given a "prognosis" of ADHD in fourth or fifth grade after teachers complained about his behavioral issues. Ms. Franklin-Sanders reluctantly agreed to put Defendant on medication, but she testified that "he became . . . a zombie, he lost weight, he just was not himself," and he had suicidal thoughts. Ms. Franklin-Sanders testified that "it broke [her] heart . . . to see a child that has been rambunctious . . . to go into sitting down and not saying a word." Ms. Franklin-Sanders took Defendant off of the medication after a few months. Though he continued

---

[2] The trial court agreed to consider Ms. Sanders's testimony for both the community corrections violation as well as potential resentencing.

in special education classes through high school, Ms. Franklin-Sanders did not seek any other mental health treatment for Defendant after he was eight years old because she "was upset with the doctor for prescribing him this [W]ellbutrin that has suicidal effects and all these other things that they tell you." Ms. Franklin-Sanders testified that Defendant started huffing gas at age thirteen and that he "probably" did drugs in high school. Ms. Franklin-Sanders believed that Defendant turned to drugs "to calm that [sic] whatever storm he was having" in his head, including dealing with the death of his grandmother and his trouble with probation.

Ms. Franklin-Sanders testified that Defendant was a "good person" with a "good heart" and that he was "a hard worker when he has a job." Ms. Franklin-Sanders testified that Defendant "did an excellent job" while he was in the Samaritan in-patient program. Defendant did not go into Samaritan's transitional living program because he had been accepted into a different program that he later learned "was not on the State-approved list." Other programs either had a waiting list or Defendant could not afford because he did not have a job at the time. Instead, Defendant returned to living with Ms. Franklin-Sanders, and she believed that he relapsed during that time. Ms. Franklin-Sanders testified that Defendant began working at McDonald's after he left Safe Harbor and that they were still holding his job. Ms. Franklin-Sanders believed that Defendant's having a job and taking classes were beneficial to his recovery.

On cross-examination, Ms. Franklin-Sanders agreed that she had attended Defendant's prior probation violation hearings and was aware of his history of supervision. She was also aware that Defendant tested positive for drugs during the periods that he was ordered to live with her but stated that all she could do was "tell him . . . [to] make good choices." Ms. Franklin-Sanders testified that Defendant was living "back and forth" between her home and with the mother of his child from the time he missed his court date in February 2016 until he was arrested in May 2016. She stated that when it came to using drugs and missing court dates, she was "not going to make a grown man do what he's supposed to do." Ms. Franklin-Sanders testified that she knew Defendant faced prison as a consequence for not complying with community corrections, which she stated was "ridiculous." As to his previous attempts at drug treatment, Ms. Franklin-Sanders claimed that the first time Defendant went to the Safe Harbor program, he left because his roommates were making meth and someone was killed near the property. She testified that Defendant was released from jail too late to start the 4:13 Strong program. Ms. Franklin-Sanders believed that the Samaritan program really helped Defendant, even though he admitted to his community corrections officer that he immediately relapsed and continued smoking marijuana. Ms. Franklin-Sanders believed that "Welcome Home Ministries would have been okay had he been able to go there" but that it was not on the list of State-approved halfway houses. Ms. Franklin-Sanders explained that Defendant was a drug user and that "[a] drug user is not, to me, going to

make the best decision for themselves, even if they are facing jail time because they are going to try to medicate themselves."

The trial court continued the hearing to give Defendant the opportunity to reapply to the General Sessions drug court program, and the prosecutor reminded the court that there had been a previous discussion about Judge Norman's drug court. At the continuation of the hearing on May 1, 2017, defense counsel announced that Defendant had been screened but was not accepted into Judge Norman's drug court program through Criminal Court Division IV. Defendant then testified on his own behalf.

Defendant testified that he attended Safe Harbor as part of the misdemeanor drug court program. As part of the program, Defendant was attending meetings, working, and "just doing everything I was asked to do." Defendant testified that on October 10, 2016, he returned from work and learned that the staff were drug testing people. Defendant stated that he reported to the office and was told that two people had tested positive and accused him of selling them the drugs. Defendant testified that Pastor Carter "wanted me to pack my stuff and get off his property or he would call the police." Defendant denied selling drugs to other residents and denied using drugs himself.

Defendant testified that part of the misdemeanor drug court program included attending meetings every Wednesday. These meetings would be attended by the participants in the program, the judge and his staff, and representatives from the halfway houses. If someone was accused of violating the program's rules, they would be "sent . . . to the back" and would either receive a sanction or be sent to jail. Defendant explained that after being kicked out of the Safe Harbor program, he missed the weekly meeting with drug court because he knew he "wouldn't have had a chance to talk and to explain [him]self." Defendant testified that he was "scared" knowing that he "was facing penitentiary time and knowing what Safe Harbor had said against [him]." Defendant stated that he went back to living between his mother's and his girlfriend's houses and that he was working part-time at McDonald's. Defendant denied using drugs during that time. Defendant stated that he would be willing to be resentenced to a higher sentence within his range if he could be placed back on community corrections and was also willing to wear an ankle monitor and continue drug treatment.

On cross-examination, Defendant identified the "agreed stipulation" that he had signed on June 6, 2016, stating that "[a] resentencing hearing will be held and a new sentence will be placed into effect" upon any subsequent violation. Defendant agreed that he had violated his community corrections sentence and stated that he was asking the court for "[m]ercy." Defendant denied testing positive for cocaine while attending Safe Harbor, denied telling Pastor Carter that he would test positive for cocaine, and denied seeing Pastor Carter downtown after curfew. The prosecutor asked whether Pastor Carter had testified truthfully, and Defendant stated that he had not. The prosecutor asked

whether Defendant believed he was "over" his drug problem, and Defendant stated that he was but that he was willing to go to "treatment classes" and "AA meetings and stuff like that."

On redirect examination, Defendant testified that after the twenty-eight-day program through Samaritan House, he would have gone directly into a halfway house except for the fact that the one he was accepted into was not on the State-approved list. Instead, Defendant went back to living with his mother while looking for another halfway house program, but he relapsed and ended up in the misdemeanor drug court program. Defendant stated that the last time he used illegal drugs was in August 2016. Defendant stated that the manager at McDonald's was holding his job for him if he were released.

In response to the trial court's questions, Defendant admitted that even though he was ordered to attend Safe Harbor for one year as part of his original guilty plea, he left because he "didn't like the environment." Defendant testified that his roommates were cooking meth and that someone was killed directly behind the building. Defendant agreed that he did not have permission to leave the program at that time. Defendant agreed that after he was violated both for leaving the program and for new drug-related arrests, he came to court with a plan to attend the Re-Entry program. Defendant testified that he was kicked out of that program after two weeks because he did not have a job. Defendant then came to the court with a plan to attend the 4:13 Strong program but explained that he did not get in because he missed all but the last two days of the physical training portion. Defendant agreed that he did not "follow up" when told that he could try again to be admitted to that program in six months, and he agreed that he did not "come back to [c]ourt and ask the [c]ourt what [he] should do." Defendant stated that the only reason he returned to the Safe Harbor program this time was because "that was the only place misdemeanor drug court had." Defendant denied ever admitting to using cocaine and stated that "[t]hey knew I would fail because of the medication I was taking."

The trial court noted that Defendant was "before the [c]ourt for his fourth violation of the alternative sentence since the entry of his guilty plea" to one count of possession with intent to sell more than .5 grams of cocaine. The trial court found that Defendant "absolutely" violated the terms of his community corrections sentence. The trial court accredited the testimony of Pastor Carter, finding that he was "not the total untrustworthy, lying individual that he is made out to be." The trial court agreed that the evidence was not sufficient to find that Defendant had sold drugs. However, the trial court found that when Defendant was brought in to discuss the accusations, he refused to take a drug test and admitted to cocaine use. The trial court stated,

> Whether he was discharged or whether he left Safe Harbor, it's really, in the [c]ourt's mind, a non-issue. The fact of the matter was he was ordered to be at Safe Harbor and follow their rules. If he left on his own, then he

directly violated an order of the [c]ourt. If he was forced to leave because he had violated the rules and regulations of Safe Harbor, he violated the order of the [c]ourt. So, it really doesn't matter how he left. The fact of the matter is he left and this is far from the first time he has not successfully completed some type of structured program to deal with the many issues that [Defendant] has.

The trial court also found that after Defendant left Safe Harbor, "he no longer made any efforts to comply with the requirements of the misdemeanor drug court, which was also a requirement of this [c]ourt." In addition to failing to attend drug court, the trial court found that Defendant failed to contact his community corrections officer "to see what his alternatives were to try and get this straightened out." The trial court also found that Defendant violated his curfew while in the Safe Harbor program.

As to the issue of resentencing, the trial court stated that it considered the evidence presented at the hearing, Defendant's history of previous violations, the purposes and principles of sentencing, the "nature and characteristics of the original conduct involved as well as [Defendant's] behavior since entry of his guilty plea," the applicable enhancing and mitigating factors, Defendant's testimony on his own behalf, and Defendant's potential for rehabilitation. The trial court found that Defendant was a Range I, standard offender. The trial court found as an enhancement factor that Defendant had a previous history of criminal convictions and behavior in addition to those necessary to establish his range. The trial court noted that after originally pleading guilty in this case, Defendant pled guilty in two other cases to simple possession and evading arrest. Defendant also had on his record a plethora of misdemeanor convictions, including six prior convictions for simple possession. The trial court also noted that while on probation in this case, Defendant had tested positive for drugs on at least three occasions. As a mitigating factor, the trial court found that Defendant's original offense did not cause or threaten serious bodily injury.

In considering whether to impose an alternative sentence, the trial court considered Defendant's present mental and physical condition, his work and educational history, his character and social history, the family and community support available to him, and his history of compliance with court-ordered programs. The trial court noted that Defendant "has not ever complied with a [c]ourt-ordered program" and that Defendant "[a]lways has reasons for it, none of which are really his fault." The trial court stated that with each violation, Defendant came to court "with some plan to address the issue that brought him in" and that the court "has listened to him, given him the benefit of the doubt, allowed him to try those programs and none of them worked." Considering the question of Defendant's honesty and candor, the trial court found that Defendant was not "straight-forward" with the court. The trial court noted that there were "numerous programs that could address at least his drug issue" but that everything that had been tried previously

"failed miserably." The trial court denied further alternative sentencing and imposed a sentence of ten years to serve.

*Analysis*

On appeal, Defendant argues that the trial court abused its discretion both in revoking Defendant's community corrections sentence and in increasing Defendant's sentence to ten years to serve. Defendant argues that the "circumstances of this case do not reflect an intent to violate the terms and conditions of his community corrections sentence" but instead "a series of missteps occasioned by fear, drug addiction, mental illness, poverty, and misfortune."

*I. Revocation of Community Corrections*

A trial court has the discretion to revoke a defendant's community corrections sentence upon a finding by a preponderance of the evidence that the defendant has violated the conditions of community corrections. *See* T.C.A. § 40-36-106(e)(3)(B) (stating that revocation proceedings shall be conducted pursuant to T.C.A. § 40-35-311); *see State v. Harkins*, 811 S.W.2d 79, 83 (Tenn. 1991) ("Given the similar nature of a community corrections sentence and a sentence of probation, . . . the same principles are applicable in deciding whether a community corrections sentence revocation was proper."). Proof of a violation need not be established beyond a reasonable doubt but must be sufficient to allow the trial court "to make a conscientious and intelligent judgment." *Harkins*, 811 S.W.2d at 82. In making this assessment, the credibility of witnesses is to be determined by the trial court. *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). The trial court's decision to revoke a community corrections sentence is subject to an abuse of discretion standard of review. *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). An abuse of discretion is shown if the record is devoid of substantial evidence to support the conclusion that a violation has occurred. *Id.* (citing *Harkins*, 811 S.W.2d at 82); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

As an initial matter, we note that the trial court found that Defendant violated his community corrections sentence by being out after curfew when such was not alleged in the violation warrant. Even under the flexible standards of an alternative sentence revocation proceeding, due process requires that a defendant receive "written notice of the claimed violations." *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973). However, "the trial court's reliance, at least in part, on a ground for revocation not noticed to the defendant has been held to be harmless if the trial court also relied upon properly noticed grounds supported by the evidence." *State v. Christopher Roy McGill*, No. M2015-01929-CCA-R3-CD, 2016 WL 3947694, at *4 (Tenn. Crim. App. Jul. 18, 2016) (citing *State v. David W. Sonnemaker*, No. E2003-01402-CCA-R3-CD, 2004 WL 483239, at *5

(Tenn. Crim. App. Mar. 12, 2004), *perm. app. denied* (Tenn. Oct. 11, 2004); *State v. Ricky Davis*, No. 03C01-9706-CC-00215, 1998 WL 205925, at *2 (Tenn. Crim. App. Apr. 29, 1998)), *no perm. app. filed*. Given the additional violations alleged in the warrant that were supported by the evidence, as discussed in further detail below, the trial court's partial reliance on the curfew violation was harmless.

Defendant argues that the State failed to establish by a preponderance of the evidence that he was "kicked out of Safe Harbor for selling drugs." The trial court found that the evidence was not sufficient to find that Defendant sold drugs while at Safe Harbor, and the record supports this finding. The accusations against Defendant were hearsay, and even Pastor Carter discounted them due to the tendency of program participants who tested positive to "rat" on someone leaving the program. However, Pastor Carter testified that when confronted with the accusations, Defendant abruptly left the program without permission. Defendant takes issue with whether he was "kicked out" of the program, as was alleged in the warrant, or whether he voluntarily left the program, as was testified to by Pastor Carter. The trial court found the distinction to be a "non-issue" because Defendant was ordered to participate in the program by the misdemeanor drug court and his departure, whether voluntary or not, was a violation of the conditions of his community corrections sentence. We agree with the trial court that the distinction is immaterial. Furthermore, Defendant testified and admitted that he was in fact "kicked out" of Safe Harbor by being told to leave the property after being accused of selling drugs. A defendant's admission to a violation of community corrections is sufficient evidence for a revocation. *See State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (holding that a defendant's concession constitutes substantial evidence of a violation, and the trial court's revocation based thereon is not an abuse of discretion).

Additionally, the violation warrant alleged that Defendant "admitted to Safe Harbor Staff that he would be positive for cocaine."[3] The trial court accredited the testimony of Pastor Carter that, upon being accused of selling drugs, Defendant did in fact make such an admission after refusing to take a drug test. The trial court found Defendant was not credible when he denied that he made such a statement to Pastor Carter. This Court will not second-guess credibility determinations on appeal. *See Mitchell*, 810 S.W.2d at 735. This violation was also established by a preponderance of the evidence.

Finally, the violation warrant alleged that Defendant violated the rule that he be "on time for all scheduled appointments" by failing to attend misdemeanor drug court

---

[3] Defendant does not address this ground for revoking his community corrections sentence in his appellate brief. Instead, referring to his absconding from misdemeanor drug court, Defendant alleges that "only one ground alleged in the community correction violation warrant was proven by a preponderance of the evidence and sustained by the trial court." In this regard, Defendant is flat wrong.

immediately after leaving the Safe Harbor program. Ms. Fuqua, a representative of the drug court program, testified that Defendant failed to attend the drug court meeting on October 12, 2016, or any subsequent meeting. Defendant admitted that he stopped attending drug court because he was afraid that he would be incarcerated without having a chance to explain his side of what happened at Safe Harbor. Defendant acknowledges on appeal that this violation was established by a preponderance of the evidence. However, Defendant urges this Court to find that the trial court abused its discretion by "revoking his community corrections sentence and placing his entire sentence into effect based upon a missed appointment" as it "does not serve the ends of justice and is not in the best interest of either the public or [Defendant]." We hold that the trial court acted well within its proper authority in revoking Defendant's community corrections sentence on this basis as well as on the grounds discussed above, especially given Defendant's pattern of repeatedly violating the rules of supervision and failing to complete various court-ordered drug treatment programs. Defendant is not entitled to relief.

## II. Resentencing

After a trial court determines that a violation has occurred, the court has the authority to revoke the community corrections sentence and may "resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration." T.C.A. § 40-36-106(e)(4). Thus, "[c]ommunity corrections revocation proceedings present two major issues: first, whether the terms of the community corrections sentence have been violated, and second, what sentence should be imposed if a revocation is warranted." *Carpenter v. State*, 136 S.W.3d 608, 612 (Tenn. 2004). A trial court's decision as to the proper consequence for a violation embodies a separate exercise of discretion from the initial finding that a violation has occurred. *State v. Hunter*, 1 S.W.3d 643, 647 (Tenn. 1999). If the trial court choses to "resentence a defendant to a sentence more severe than the original, the trial court must conduct a sentencing hearing pursuant to the principles of the Sentencing Reform Act." *State v. Crook*, 2 S.W.3d 238, 240 (Tenn. Crim. App. 1998) (citations omitted). The trial court's sentencing decision is reviewed under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-710.

The record reflects that the trial court mindfully conducted a thorough resentencing hearing and considered all of the statutory purposes and principles of sentencing. *See* T.C.A. §§ 40-35-102; -103; -210. The trial court found as an enhancement factor that Defendant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish his sentencing range. *See*

T.C.A. § 40-35-114(1). The court found particularly noteworthy the fact that Defendant had been arrested for and pled guilty to simple possession and evading arrest while on probation in this case. Additionally, the trial court considered Defendant's extensive history of failing to comply with court-ordered drug treatment programs and history of absconding from supervision. *See* T.C.A. § 40-35-103(1)(C) (stating that sentences involving confinement may be based on the consideration that "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant"). The trial court found as a mitigating factor that the original crime to which Defendant pled guilty neither caused nor threatened serious bodily injury. *See* T.C.A. § 40-35-113(1). The sentence imposed by the trial court—ten years—is within the appropriate range for the Class B felony of selling more than .5 grams of cocaine. *See* T.C.A. §§ 39-17-417(c)(1); 40-35-112(a)(2). Thus, the trial court's sentencing decision is granted a presumption of reasonableness.

Defendant argues that the trial court abused its discretion in imposing a sentence of ten years' incarceration because the trial court failed to consider certain mitigating factors and because the sentence is greater than that deserved for the offense committed and is not the least severe sentence necessary to achieve the purposes for which the sentence is imposed. *See* T.C.A. §§ 40-35-103(2), (4); -133(13). Defendant argues that the trial court should have considered his drug addiction as a mitigating factor as well as the fact that he pled guilty to the original offense, thereby saving the State the time and expense of a trial. However, the fact that a trial court fails to consider a specific mitigating factor suggested by a defendant does not render a sentence unreasonable. *See Bise*, 380 S.W.3d at 706 ("[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."); *State v. Robert Pruitt*, No. W2010-02269-CCA-R3-CD, 2013 WL 865330, at *11 (Tenn. Crim. App. Mar. 6, 2013) (noting that "a trial court's mere failure to give effect to mitigating evidence offered by the defendant provides no grounds for relief under *Bise*"), *no perm. app. filed*. Moreover, Defendant does not suggest that the trial court erred in applying the enhancement factor with regard to his criminal history or in finding that this enhancement factor outweighed the mitigating factor that it did apply. Finally, the trial court expressly considered on the record that the sentence it imposed should be "the least severe measure necessary to achieve the purpose [for] which it is being imposed." The trial court did not abuse its discretion in resentencing Defendant to ten years and ordering Defendant to serve his sentence in confinement. By denying the drug addicted Defendant another opportunity at alternative sentencing, the trial court disengaged from the enabling practices of others, evidenced in the record, in Defendant's self-destructive life style. Defendant is not entitled to relief.

*Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE